sIn The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-23-00388-CR
_____

### BRIAN KEITH MELONSON, Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. F22-40299**

### MEMORANDUM OPINION

Appellant Brian Keith Melonson appeals his conviction for burglary of a building. *See* Tex. Penal Code Ann. § 30.02(a)(1). A grand jury indicted Melonson for burglary of a building on June 15, 2022, in Jefferson County, and alleged in the indictment that Melonson was previously convicted of two felony offenses. Melonson pleaded not guilty, and a jury found Melonson guilty as charged in the indictment. Melonson pleaded "true" to the enhancement allegations, and the jury assessed punishment at five years of confinement and a fine of $2,000. Melonson

1

timely appealed. On appeal, Melonson challenges the sufficiency of the evidence supporting his conviction.

Evidence at Trial

Testimony of Ryan Weir

Officer Ryan Weir with the Beaumont Police Department testified that on June 15, 2022, he was dispatched to a convenience store on Highway 105 to assist another officer in response to an alarm going off at the convenience store. According to Officer Weir, when he arrived at the store, the store's alarm was going off, the store was closed, the window on the door was broken, and it appeared that someone had entered the store without permission. Officer Weir testified that he activated his body camera prior to walking inside the store and that no one was inside the store. The recording from Officer Weir's body camera was admitted into evidence and published to the jury. Two employees that worked at the store, Mandy and Melanie,[1] arrived at the scene while Officer Weir was there. Officer Weir testified that the store had surveillance cameras, and he and the employees looked at the store's surveillance footage. The employees identified the perpetrator depicted in the surveillance footage as Melonson, a former employee at the store who had the combination to the store's safe. Photos from the crime scene were admitted into

_____

[1] We use pseudonyms to refer to witnesses other than law enforcement and the defendant.

evidence and published to the jury. Officer Weir testified that one of the photographs showed a large piece of concrete rock that Officer Weir saw the suspect on the video throw a couple of times at the door that was broken. Officer Weir recalled that the employees provided him with Melonson's address, an apartment which was approximately two blocks from the store, and Officer Weir went to the apartment to find Melonson. According to Officer Weir, when he arrived at the apartment, the lights were on, law enforcement knocked on the door, an occupant "peeked out the blind[,]" law enforcement announced themselves, the lights were then turned out, and no one ever answered the door despite law enforcement waiting several minutes.

Mandy's Testimony

Mandy testified that on June 15, 2022, she was employed at the store that was burglarized, and at the time of trial she had worked at that store for three years. At trial, Mandy identified the defendant as Melonson and testified that Melonson was "a regular customer [at the store] at first," and then later Melonson was hired to work at the store as an employee. According to Mandy, she and the other manager, Melanie, trained Melonson when he was hired. Mandy testified that the store's safe was located underneath a cabinet by the cash register, the safe was not visible to the general public, and the employees had the combination to the safe. Mandy recalled that at the time the store was burglarized, the employees were herself, Melanie, and Denise. According to Mandy, Melonson had recently been fired. Mandy testified

3

that whoever was scheduled to work in the evening "closes the store" when they leave, which includes locking the doors, doing paperwork, putting money in the safe by opening the safe with a four-digit code and putting the register drawer inside the safe, locking the safe, turning the lights out, and setting the alarm before leaving. According to Mandy, "drops" of money were typically made throughout the day into a part of the safe only accessible by the owner. Mandy explained that the only portion of the safe that an employee could access is that part of the safe where they keep a blue bag with $500, another blue bag with additional extra cash, and where the register drawer is placed at night. Mandy testified that the store closes at either 11:00 p.m. or "midnight" depending on the day of the week. According to Mandy, the store usually had four employees, and Melonson was the only male who had been employed there during the year and a half period before the burglary.

According to Mandy, around 2:30 a.m. on the morning of June 15, 2022, an officer with the Beaumont Police Department called her and informed her there had been a problem at the store. Mandy testified that she, the store manager at the time (Melanie), and Denise (another employee) arrived at the store and the door was still locked but the glass on the door was broken. Mandy recalled that there was a "busted door with glass all over the floor[,]" the rock that went through the glass had hit beer that was displayed by the door, beer was knocked down and spilled all over the floor,

4

the store was a "complete mess[,]" the safe was wide open, and the cash register drawer had been pulled out.

Mandy testified that Melonson had worked at the store for about three months, and she was the person who informed Melonson that he was being terminated for "[p]oor work ethics [and] [h]e wasn't doing the job." She recalled that Melonson was fired a short time before the burglary. Mandy testified that when employees were terminated, they confiscated the keys from the employees at the time of termination. However, according to Mandy, Melonson still had the combination to the safe because the combination was not changed after he was fired. At the time of trial Mandy was a manager of the store, and she agreed that it was "bad practice[]" for the store to "not change" the code to the safe after an employee leaves. She agreed that the store has had numerous former employees, and she assumed that the code to the safe had never been changed.

According to Mandy, the perpetrator in the surveillance videos did not take lottery tickets or cigarettes, did not try to get into the visible cash register, but instead went straight to the safe. Mandy testified that the store has security cameras inside and outside of the store, that law enforcement asked her to find the video footage, and she located the footage and viewed it with law enforcement. Mandy explained that when she viewed the store's security surveillance video footage, the person in the video that broke the glass to enter the store was not supposed to be in the store.

5

She could see on the video that the perpetrator "punch[ed] in" the code to the safe to open it, and the perpetrator took the blue bags, and only store employees knew the location and contents of the blue bags. Mandy identified Melonson as the perpetrator on the video "[b]y his walk, by his pants, by his shoes because that's what he wore when he came to work." Mandy said that Melonson also knew the code to the safe, he was left-handed, and the video showed that after the perpetrator left the store, he walked towards the direction where Melonson lived. Mandy recalled that in the video, the perpetrator wore the same red shoes and stonewashed, ripped jeans that Melonson used to wear to work. According to Mandy, the perpetrator took money from the safe and the broken door had to be replaced. The video footage from the store's surveillance camera system was admitted into evidence and published to the jury. Mandy testified that the perpetrator in the video did not look like Melanie or Denise, and she told the jury that she was sure that the perpetrator in the surveillance video was Melonson.

Testimony of Ronnie Freeman

Detective and Forensic Analyst Ronnie Freeman with the Beaumont Police Department testified that he was assigned to the case and that Melanie, the store manager, identified Melonson as the perpetrator in the surveillance video. Detective Freeman testified that he called Melonson at a phone number he obtained from employment records provided to Freeman by the store employees. According to

6

Detective Freeman, Melonson answered the phone, and when Detective Freeman informed Melonson that he was investigating the burglary, Melonson refused to talk to him. Detective Freeman told Melonson they would continue the investigation without Melonson's statement, and Melonson told Detective Freeman to "do my thing[.]"

Detective Freeman recalled that he served a search warrant on T-Mobile, Melonson's cell phone provider, for information within a very narrow time frame of the burglary as to where Melonson's cell phone pinged. Detective Freeman testified that during the time of the burglary, Melonson's cell phone pinged to a tower that is "like right across the street[]" from the burglarized store and near the apartment where Detective Freeman knew Melonson lived. The business records provided by T-Mobile in response to the search warrant were admitted into evidence. Detective Freeman testified that it was approximately a nine-minute or half-a-mile walk from the store to Melonson's apartment.

Detective Freeman testified that photographs of a man Freeman identified as the defendant were obtained from the Facebook account for "Brian Beezy Melonson" and that the photographs from Facebook depicted Melonson wearing stonewashed jeans that were torn in the same areas as the jeans worn by the perpetrator in the surveillance videos. The photographs were admitted into evidence and published to the jury. According to Detective Freeman, after he considered the

details of what his investigation had revealed—Melonson's Facebook page, Melonson's phone records, information from Mandy and Melanie, the surveillance video from the burglary, the perpetrator's appearance, mannerisms, clothing, left-handedness which matched Melonson, and that Melonson had recently been terminated and he knew the code to the safe—Detective Freeman concluded that Melonson had committed the burglary. On cross-examination, Detective Freeman agreed that he had no other suspects, he had only focused on Melonson as a suspect, and he never met Melonson.

Melanie's Testimony

Melanie testified that on June 15, 2022, she was the manager at the store and that at that time she had been the store manager for almost four years. Melanie testified that as store manager she "hired, fired, led a shift, made schedules, did truck orders[,]" and the only male hired in the four years she was at the store was Brian Melonson, and the only other employee at any other store associated with the store she managed was a white male. Melanie recalled that Melonson was fired because he did not perform his job; when customers would come in to buy cigars, he would tell them he had weed for sale; and he placed a bucket on the counter saying that he was collecting money to feed the homeless.

According to Melanie, around 2:30 a.m. on June 15, 2022, the police department called her to come to the store because it had been "broken into." When

she arrived, only Beaumont Police Department personnel were on the scene and the glass on the store's door had been broken. Melanie testified that the store had been closed for the night, no one had permission to be in the store at that time, and it was apparent after talking to the store's owner that he had not given anyone permission to break the glass and enter his store. According to Melanie, there was $1,400 in the safe that night and the code to the safe had stayed the same for the four years she had worked there.

Melanie testified that she let the police videotape the footage from the store's surveillance system and that one of the videos admitted at trial showed a man she recognized as Melonson at the front of the store at 2:22 in the morning. According to Melanie, she had trained and supervised Melonson, which meant seeing him daily as an employee, and that she saw him often as a customer before he was employed at the store. Melanie testified she recognized him in the surveillance video "[f]rom the way he walked, from the shoes and the pants." Melanie testified that Melonson would show up to work in red shoes like the ones in the video and would wear torn, whitewashed jeans like the person in the video. Melanie recalled that Melonson was left-handed, as was the person in the video. Melanie testified that the suspect in the video went straight to the safe that was not visible to the public, the suspect did not concern himself with the cash register or the change but immediately went for the two blue bags of money, and only an employee or the owner would know the bags

9

had that much money in them. According to Melanie, when she saw the video, she knew the person in the video was Melonson and she had no doubt in her mind that it was him.

Melonson's Testimony

Melonson testified in his own defense. He testified that he was a customer of the store and worked there about a month and a half until he was fired for being late to work. According to Melonson, Melanie—not Mandy—trained him. Melonson testified that he committed aggravated robbery when he was seventeen years old, and he pled guilty to the offense and served a five-year sentence. Melonson testified that he was on parole for possession of a firearm, and his probation for being a felon in possession of a firearm was revoked because he was accused of shooting someone and was charged with possession of a firearm, and he served six years of incarceration. Melonson recalled that when he was on probation, Melanie gave him a chance and offered him the job at the store even though she knew he was on felony parole.

Melonson testified that although he had red shoes, there was "no proof" that he had the same shoes as the person in the video. He testified that as to the red shoes worn by the perpetrator in the video, he had "never seen those shoes in [his] life." Melonson testified that everyone wears stonewashed jeans with "rips." According to Melonson, some of the employees' boyfriends could have been told the code to the

10

safe. Melonson agreed that he did sell weed as testified to by Melanie, but he said he did not commit the burglary and it was not him in the video. Melonson testified that although the perpetrator in the video threw the rock with his left hand, the perpetrator opened the safe with his right hand so the perpetrator could have been left or right-handed. However, Melonson agreed that he can do a lot of things with his right hand. Melonson testified that no one has proof that the lights were turned off when law enforcement came to his apartment after the burglary, and that when the detective called him, he told the detective that he would not come down to the police station but that the detective could come to Melonson's house and talk to him there. According to Melonson, Mandy and Melanie concocted the story to blame him for the burglary, and all the other witnesses at trial were telling at least partial lies and he was telling the "whole truth[.]"

## Issue on Appeal

In Melonson's sole issue on appeal, he challenges the sufficiency of the evidence supporting his conviction. Specifically, he argues that there is insufficient evidence to support the jury's finding that he is the person who committed the offense. Melonson contends identity "was contested and was based upon conjecture[,]" and "that [t]he characteristics used by the witnesses to identify [Melonson] were common and not sufficiently exclusive to [Melonson] to support a conviction."

11

Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010) (citing *Jackson*, 443 U.S. at 326); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000)*, overruled on other grounds, Laster v. State*, 275 S.W.3d 512 (Tex. Crim. App. 2009); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995). The appellate court does not reweigh the evidence nor determine the credibility of the evidence, nor does it substitute its own judgment for that of the

12

factfinder. *Febus*, 542 S.W.3d at 572; *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993).

A person commits burglary of a building "if, without the effective consent of the owner, the person . . . enters [] a building (or any portion of a building) not then open to the public, with intent to commit a felony, theft, or an assault[.]" *See* Tex. Penal Code Ann. § 30.02(a)(1). "Identity may be proven by direct evidence, circumstantial evidence, or by reasonable inferences from the evidence." *See Ingerson v. State*, 559 S.W.3d 501, 509 (Tex. Crim. App. 2018) (citing *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009)). The identity of the defendant as the perpetrator of the alleged crime may be proven by inferences, and when there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the defendant

13

as the perpetrator of the crime. *Clark v. State*, 47 S.W.3d 211, 214 (Tex. App.—Beaumont 2001, no pet.). The question in a sufficiency review where the defendant argues the circumstantial evidence is insufficient to support the verdict is whether the verdict the jury reached is reasonable given the combined and cumulative force of the incriminating circumstances based on evidence before the jury in the defendant's trial. *Temple*, 390 S.W.3d at 359. Even when the parties "disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985)).

Analysis

The jury heard Officer Weir testify that he and the employees looked at the store's surveillance footage, and the employees identified the perpetrator as Melonson, a former employee at the store who had a combination to the store's safe. Also before the jury was Officer Weir's testimony that when Weir arrived at Melonson's apartment, the lights were on, law enforcement knocked on the door, an occupant "peeked out the blind[,]" law enforcement announced themselves, the lights were turned out, and no one ever answered the door despite law enforcement waiting several minutes. The jury heard Mandy testify that Melonson had been fired from his employment at the store shortly before the burglary and had the code to the

safe, that the perpetrator in the surveillance footage appeared to go straight to the safe and "punched in" the code to open it and took the blue bags that only store employees knew the location and contents of. Mandy also stated she was sure that Melonson is the person in the surveillance footage because the perpetrator wore clothes that she had seen Melonson wear to work, he had a distinctive walk, he knew the code to the safe, he was left-handed, and he left the store in the direction where Melonson lived.

The jury heard Melanie testify that at the time of the burglary the store had been closed, no one had permission to be in the store, and it was apparent after talking to the store's owner that he had not given anyone permission to break the glass and enter his store. Before the jury was Melanie's testimony that there was $1,400 in the safe that night and the code to the safe had stayed the same for the four years she had worked there. The jury heard Melanie testify that she had hired and fired Melonson; that she had trained and supervised him; he was a regular customer before he was employed at the store; she recognized him in the surveillance video "[f]rom the way he walked, from the shoes and the pants[;]" Melonson would show up to work in red shoes like the shoes worn by the man in the video and Melonson would wear torn, whitewashed jeans like the person wore in the store's surveillance video. She explained that Melonson was left-handed, as was the person in the video; the suspect in the video went straight to the safe that was not visible to the public;

15

and the suspect did not concern himself with the cash register or the change but immediately went for the two blue bags of money; and only an employee or the owner would know the blue bags had money in them. The jury heard both Mandy and Melanie testify that they were sure that the perpetrator from the video surveillance was Melonson.

The jury also heard Detective Freeman's testimony that Mandy and Melanie both identified Melonson as the perpetrator in the surveillance video, that when he contacted Melonson about investigating the crime Melonson refused to talk to him, that it was a nine minute or half-a-mile walk from the store to Melonson's apartment, that during the time frame of the burglary the subpoenaed cell phone records showed Melonson was in the area of the store, and that Melonson's Facebook account depicted photographs of Melonson wearing jeans with rips in the same areas as the perpetrator's in the surveillance video. The jury heard Detective Freeman testify that when he considered Melonson's Facebook page; Melonson's phone records; information from Mandy and Melanie; the surveillance video from the burglary; and the perpetrator's appearance, mannerisms, clothing, left-handedness; and that the perpetrator knew the code to the safe; Detective Freeman concluded that Melonson had committed the burglary.

The jury viewed the surveillance footage from the store's cameras and viewed photographs from Melonson's Facebook account which showed Melonson wearing

jeans that appear to be similar to the jeans worn by the perpetrator. The jury heard Melonson testify that he had been fired from the store, that he had similar jeans and shoes as the perpetrator, that he was left-handed, that the other witnesses had lied, that Mandy and Melanie were covering up their theft of the money, and that he did not commit the burglary.

Having viewed the evidence in the light most favorable to the verdict, we conclude that a rational factfinder could have found beyond a reasonable doubt that Melonson, without the consent of the owner, entered the store when it was not open to the public, with the intent to commit a theft. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360; *see also* Tex. Penal Code Ann. § 30.02(a)(1). The jury assessed the credibility and demeanor of the witnesses who testified at trial, and we presume that the jury resolved all conflicts in the testimony, weighed the evidence, and drew reasonable inferences from the evidence in a manner that supports the verdict. *See Hooper*, 214 S.W.3d at 13; *Brooks*, 323 S.W.3d at 899 n.13; *Clayton*, 235 S.W.3d at 778. The jury could have reasonably concluded beyond a reasonable doubt from the evidence presented that Melonson was the person who burglarized the store, as alleged in the indictment. We conclude that "[t]his was not a determination so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012).

As explained above, we overrule Melonson's issue on appeal and affirm the trial court's judgment.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on July 22, 2024
Opinion Delivered August 28, 2024
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.

18